1

2

3

4

5

6

7

8                           **UNITED STATES DISTRICT COURT**

9                            **EASTERN DISTRICT OF CALIFORNIA**

10

11    ATAIN SPECIALTY INSURANCE                No.  2:14-cv-00609-TLN-DB
      COMPANY,
12
                      Plaintiff,
13    v.                                         **ORDER**

14    SIERRA PACIFIC MANAGEMENT
      COMPANY and CALIFORNIA CAPITAL
15    INSURANCE COMPANY,

16                    Defendants.

17
      CALIFORNIA CAPITAL INSURANCE
18    COMPANY,

19                    Counterclaimant,
      v.
20
      ATAIN SPECIALTY INSURANCE
21    COMPANY,

22                    Counterdefendant.

23
      CALIFORNIA CAPITAL INSURANCE
24    COMPANY,

25                    Third-Party Plaintiff,
      v.
26
      JERRY LEE and BETTY LEE,
27
                      Third-Party Defendants.
28

1

This matter is before the Court on Plaintiff Atain Specialty Insurance Company's ("Atain") motion for summary judgment (ECF No. 49), Defendant and Counterclaimant California Capital Insurance Company's ("California Capital") motion for partial summary judgment (ECF No. 54), and Third-Party Defendants Jerry Lee and Betty Lee's motion for summary judgment (ECF No. 48). For the reasons discussed below, Atain's motion is GRANTED, California Capital's motion is DENIED, and the Lees' motion is GRANTED.

## I.    FACTUAL BACKGROUND

This case involves two separate disputes, both about who must bear the costs of defending and settling an underlying personal injury lawsuit. The first is a coverage dispute between two insurance companies, Atain and California Capital. The second is a dispute between California Capital and its insureds, Jerry and Betty Lee, over whether the Lees must reimburse California Capital for a portion of what it paid on the Lees' behalf to settle the underlying lawsuit.

The underlying lawsuit was *Deanna Dailey v. Lee Jerry/Betty '98 Fam RV TR, et al.*, No. CVCS 11-1339 (Sutter Cty. Super. Ct. filed June 16, 2011) (*Dailey*). (Pl.'s Resp. to Def.'s Stmt. Undisp. Facts (SUF1) No. 1, ECF No. 63.) In *Dailey*, Deanna Dailey sued both the owner and the property management company of the Pagoda Garden Apartments, where Dailey had lived for roughly ten years. (SUF1 Nos. 1–3, ECF No. 63.) The owner of Pagoda Garden was a trust named Lee Jerry/Betty '98 Fam RV TR.[1] The property management company was Sierra Pacific Management Company, Inc ("Sierra Pacfic").

The *Dailey* complaint alleged that while living at Pagoda Garden, Dailey developed a severe pulmonary illness that doctors later opined was a form of hypersensitivity pneumonitis called Pigeon Breeder's Disease. (SUF1 Nos. 3, 35–36, ECF No. 63.) Although Dailey was not a pigeon breeder, for nearly a decade Dailey had unwittingly breathed a fine dust of pigeon feathers and pigeon droppings—carried into her apartment through the building's ventilation system. (Def.'s Resp. to Pl.'s Stmt. Undisp. Facts (SUF2) Nos. 18–21, ECF No. 72.) The pigeons roosted on the roof of Dailey's building, in and around the roof-mounted heating, ventilation, and air conditioning (HVAC) units. (SUF2 No. 19, ECF No. 72.) Dailey alleged that the Lees and Sierra

---

[1] The Court refers to the owner as the Lees for the sake of clarity.

1    Pacific had been negligent in owning and maintaining Pagoda Garden because they did not keep

2    the pigeons away from the HVAC units.  (SUF2 No. 19, ECF No. 72.)  Dailey also alleged that

3    the Lees and Sierra Pacific had been negligent because they failed to warn tenants of the health

4    dangers associated with the building's pigeon problem.  (SUF2 No. 20, ECF No. 72.)  Both the

5    Lees and Sierra Pacific turned to their insurance companies for defense and indemnification.

6         Those insurance companies are the original parties in this case.  Atain insured Sierra

7    Pacific.  (SUF1 Nos. 4–7, ECF No. 63.)  California Capital insured the Lees.  (SUF2 Nos. 59, 62,

8    ECF No. 72.)  California Capital also insured Sierra Pacific as an additional insured under the

9    policies it issued to the Lees.  (SUF2 Nos. 59, 62, ECF No. 72.)  Sierra Pacific tendered its

10   defense to Atain three times.  (SUF2 Nos. 22, 37, 42, ECF No. 72.)  Atain declined the tender

11   each time, citing policy provisions that ostensibly precluded coverage, but tendered the defense to

12   California Capital.  (SUF2 Nos. 32–35, 40–41, 46–47, ECF No. 72.)  California Capital

13   undertook the defense and Sierra Pacific assigned its rights against Atain to California Capital.

14   (SUF2 No. 36, ECF No. 72; Stargardter Decl. Ex. H, ECF No. 52-8.)  California Capital

15   eventually paid $1.9 million to settle the *Dailey* lawsuit.  (SUF2 No. 50, ECF No. 72.)  Atain did

16   not contribute to the defense or the settlement.  The insurance companies dispute whether Atain

17   had a duty to defend and indemnify Sierra Pacific in *Dailey*.

18        In this lawsuit, the insurance companies ask the Court to determine whether Atain was

19   required to contribute.  Atain seeks a declaratory judgment that it was not required to defend or

20   indemnify Sierra Pacific in *Dailey*.  (Pl.'s Compl. ¶¶ 44–79, ECF No. 1.)  California Capital seeks

21   the opposite, and requests equitable contribution and indemnity from Atain.  (Df.'s Answer and

22   Countercl., ¶¶ 26–42, ECF No. 14.)  Armed with Sierra Pacific's assignment of rights, California

23   Capital also asserts claims against Atain for breach of contract and bad faith based on Atain's

24   repeated refusals to defend and indemnify Sierra Pacific.  (Df.'s Answer and Countercl., ¶¶ 43–

25   54, ECF No. 14.)  Finally, in its third-party complaint against the Lees, California Capital seeks a

26   declaratory judgment that its coverage of the Lees was limited to $1 million.  (Third-Party Compl.

27   (TPC) ¶¶ 11–12, ECF No. 15.)  And because California Capital spent more than $1 million to

28   settle and defend the *Dailey* lawsuit, California Capital also seeks $900,000 in reimbursement

1   from the Lees.  (TPC ¶¶ 16–25, ECF No. 15.)

2   **II.   REQUESTS FOR JUDICIAL NOTICE**

3   Atain asks the Court to take judicial notice of the *Dailey* complaint.  (Pl.'s RJN, ECF No.

4   53.)  The *Dailey* complaint is docketed in several places, including (ECF No. 53-1.)  California

5   Capital asks the Court to take judicial notice of an order entered in *Dailey* following a hearing on

6   a motion for summary judgment.  (Df.'s RJN, ECF No. 57.)  That order is docketed as (Ex.1 to

7   California Capital's Index of Documentary Evidence, ECF No. 60-1.)  These requests are not

8   opposed.

9   The Court may take judicial notice of facts that can be "accurately and readily determined

10  from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  The

11  record of a state court proceeding is one such source.  *E.g.*, *NuCal Foods, Inc. v. Quality Egg*

12  *LLC*, 887 F.Supp.2d 977, 984 (E.D. Cal. 2012).  The Court cannot accept the representations

13  made in the state court documents as true, but it may take judicial notice of the documents

14  themselves and the fact that those representations were made.  *Id.*  Subject to that caveat, both

15  requests are granted.

16  **III.   LEGAL STANDARDS**

17  A. <u>Summary Judgment</u>

18  Summary judgment is proper if there are no genuine disputes as to any material facts and

19  the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp.*

20  *v. Catrett*, 477 U.S. 317, 322 (1986).  "The inquiry performed is the threshold inquiry of

21  determining whether there is the need for a trial—whether, in other words, there are any genuine

22  factual issues that properly can be resolved only by a finder of fact because they may reasonably

23  be resolved in favor of either party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

24  A district court should grant summary judgment if the evidence "would require a directed verdict

25  for the moving party."  *Id.* at 251.  Cross motions for summary judgment are evaluated separately

26  under the same standard.  *Am. Civil Liberties Union of Nev. v. City of Las Vegas¸* 333 F.3d 1092,

27  1097 (9th Cir. 2003).  Here, the parties dispute how the Court should interpret the relevant

28  insurance policies.  That is a question of law.  *Waller v. Truck Ins. Exch., Inc.*, 11 Cal.4th 1, 18

1   (1995).

2                       B.   California Law on Interpreting Insurance Policies

3          This is a diversity case, so the Court will apply California law to interpret the insurance

4   policies.  *See Bell Lavalin, Inc. v. Simcoe and Erie General Ins. Co.*, 61 F.3d 742, 745 (9th Cir.

5   1995) (applying state law in diversity suit about insurance policy interpretation).  "Interpretation

6   of an insurance policy is a question of law and follows the general rules of contract

7   interpretation."  *MacKinnon v. Truck Ins. Exch.*, 31 Cal. 4th 635, 647 (2003) (citing *Waller*, 11

8   Cal.4th at 18).

9          In California, a contract must be interpreted "to give effect to the mutual intention of the

10  parties as it existed at the time of contracting."  Cal. Civ. Code § 1636.  If possible, the Court will

11  infer that mutual intention solely from the plain language of the contract, read as a whole.  *Id.* at

12  §§ 1638, 1641.  The Court must read contract language in its "ordinary and popular sense," unless

13  the parties specify otherwise or particular words have taken on a special meaning through usage.

14  *Id.* at 1644.  The Court may find that a policy provision is ambiguous if the provision is capable

15  of two or more reasonable constructions.  *MacKinnon*, 31 Cal. 4th at 648.  "But language in a

16  contract must be interpreted as a whole, and in the circumstances of the case, and cannot be found

17  to be ambiguous in the abstract."  *Id.*  In the insurance context, coverage provisions are

18  "interpreted broadly so as to afford the greatest possible protection to the insured, [whereas] ...

19  exclusionary clauses are interpreted narrowly against the insurer."  *Id.*  If the Court finds that

20  particular terms are ambiguous, it will interpret them to protect the "objectively reasonable

21  expectations of the insured."  *State v. Allstate Ins. Co.*, 45 Cal. 4th 1008, 1018 (2009).

22      **IV.   ANALYSIS**

23         All three parties have filed motions for summary judgment.  The Court begins with the

24  Lees' motion for summary judgement because it involves an issue that also affects the motions by

25  Atain and California Capital.  The Court then turns to Atain's motion for summary judgment and

26  California Capital's cross-motion for partial summary judgment.  Both of those motions address

27  the same primary legal issue: whether Atain had a duty to defend and indemnify Sierra Pacific in

28  *Dailey*.  The Court has considered the motions separately, but, because the motions both concern

1    the same issue, the Court addresses them simultaneously.  Lastly, the Court considers Atain's

2    motion for summary judgment on California Capital's claim for breach of the implied covenant of

3    good faith and fair dealing.

4                    A.   The Lees' Motion for Summary Judgment: Stacking

5            California Capital insured the Lees under six successive liability policies in effect from

6    February 2006 through February 2012.[2]  Each policy was in effect for one year.  Each policy

7    states that the Lees' coverage under the policy is limited to $1 million per occurrence and $2

8    million in aggregate.[3]  California Capital claims that each policy's per-occurrence limit caps its

9    overall coverage of the Lees at $1million.  (TPC ¶ 12, ECF No. 15.)  California Capital also

10   claims that it is entitled to $900,000 in reimbursement under *Blue Ridge Ins. Co. v. Jacobsen*, 25

11   Cal. 4th 489 (2001).  (TPC ¶¶ 22–25, ECF No. 15.)  In their motion for summary judgment, the

12   Lees argue that the *Dailey* settlement did not exceed the limits of their policies.  (Third-Party

13   Defs.' Mot. for Summ. J. ("Lee Mot.") 10:1–12:5, ECF No. 48-1.)  Specifically, the Lees argue

14   that their policies may be "stacked."  (Lee Mot. 11:23–12:5, ECF No. 48-1.)  The Lees also argue

15   that California Capital cannot meet the elements of *Blue Ridge* so reimbursement is not available.

16   (Lee Mot. 12:7–17:26, ECF No. 48-1.)

17           Continuous injury cases like *Dailey* often involve a single occurrence that stretches across

18   multiple policy periods.  In those cases, per-occurrence policy limits sometimes "stop[] short of

19   satisfying the coverage responsibilities of the policies" and leave the insured vastly under-

20   protected.  *State of Cal. v. Cont'l Ins. Co.*, 55 Cal. 4th 186, 200 (2012).  Policy limits may be

21   "stacked" to avoid that outcome.  In this context, stacking means combining the policy limits of

22   each policy period to "form one giant 'uber-policy' with a coverage limit equal to the sum of all

23   purchased insurance policies."  *Id.* at 201.  If the Lees' policies are stacked, they will be insured

24   for several million dollars because the *Dailey* complaint alleged a continuous injury spanning

25   multiple policy periods.  *Cf. Cont'l*, 55 Cal. 4th at 201–02.  If not, they will only be insured up to

---

[2]      Nott Decl. Ex. B ("2006 Policy") at 2, ECF No. 48-4; Nott Decl. Ex. C ("2007 Policy") at 2, ECF No. 48-5;
Nott Decl. Ex. D ("2008 Policy") at 2, ECF No. 48-6; Nott Decl. Ex. E ("2009 Policy") at 2, ECF No. 48-7; Nott
Decl. Ex. F ("2010 Policy") at 2, ECF No. 48-8; Nott Decl. Ex. G ("2011 Policy") at 2, ECF No. 48-9.
[3]      2006 Policy at 3, ECF No. 48-4; 2007 Policy at 4, ECF No. 48-5; 2008 Policy at 4, ECF No. 48-6; 2009
Policy at 4, ECF No. 48-7; 2010 Policy at 3, ECF No. 48-8; 2011 Policy at 3, ECF No. 48-9.

1  $1 million for each occurrence, regardless of the length of that occurrence.

2      California law favors stacking in continuous-injury cases.  In *Continental*, the Supreme

3  Court of California held that standard policy language permits policies to be stacked and that a

4  pro-stacking rule vindicates the parties' reasonable expectations regarding indemnification and

5  liability.  *Cont'l*, 55 Cal. 4th at 201.  "[T]he insurer reasonably expects to pay for . . . damage

6  occurring during a long-tail loss it covered, but only up to its policy limits, while the insured

7  reasonably expects indemnification for the time periods in which it purchased insurance

8  coverage."  *Id.*  But the *Continental* court was quick to add that insurers could avoid stacking by

9  including anti-stacking provisions in their policies.  *Id.* at 202.

10      California Capital and the Lees dispute whether the policies in this case contain anti-

11  stacking provisions.  California Capital argues that the "Liability and Medical Expenses Limits of

12  Insurance" section in each policy is an anti-stacking provision.  (Third-Party Pl.'s Opp'n to Third-

13  Party Defs.' Mot. for Summ. J. ("Opp'n to Lee Mot.") 5:14–19, ECF No. 66.)  In each policy, that

14  section states:

15          **D. Liability and Medical Expenses Limits of Insurance**

16      . . . .

17          2. The most we will pay for the sum of all damages because of all:

18          a. "Bodily injury," property damage" and medical expenses arising
           out of any one "occurrence" . . . .

19

20      . . . .

21          is the Liability and Medical Expenses limit shown in the
           Declarations.

22

23  (Third-Party Defs.' Resp. to Third-Party Pl.'s Stmt. Undisp. Facts (SUF3) No. 2, ECF No. 75.)

24  In each policy, that section also states "the limits of this policy apply separately to each

25  consecutive annual period and to any remaining period of less than 12 months."[4]  Each policy

26  defines "occurrence" as "an accident, including continuous or repeated exposure to substantially

27

28  _____

[4]      2006 Policy at 42, ECF No. 48-4; 2007 Policy at 42, ECF No. 48-5; 2008 Policy at 42, ECF No. 48-6; 2009 Policy at 42, ECF No. 48-7; 2010 Policy at 43, ECF No. 48-8; 2011 Policy at 41, ECF No. 48-9.

1    the same general harmful conditions." (SUF3 No. 3, ECF No. 75.) For each policy, the limit

2    shown in the Declarations is $1 million per occurrence.[5] Finally, the Declarations page of each

3    policy states that "each paid claim . . . reduces the amount of insurance provided during [the]

4    applicable annual period."[6]

5          The Lees argue that the policy limits are simply policy limits, not anti-stacking provisions.

6    (Lee Mot. 8:6–22, 11:23–25, ECF No. 48-1.) According to the Lees, the policy limits do "not

7    provide that the limit of liability for a single year bars additional years of coverage when the

8    conduct and injuries span multiple policy periods or where there are ongoing or continuous

9    injuries." (Lee Mot. 8:9–11, ECF No. 48-1.) The Lees also point out that each policy refers to its

10    policy limits on an annual basis. (Lee Mot. 8:3–5, 8:12–15, ECF No. 48-1.) According to the

11    Lees, the California Capital policies do not take the *Continental* court up on its suggestion to

12    include anti-stacking language. (Lee Mot. 8:19–22, ECF No. 48-1.) The Lees assert that they

13    reasonably expected multiple years of protection in return for buying multiple years of coverage.

14    (Lee Mot. 10:11–10:22, ECF No. 48-1.)

15          California Capital replies that its policies, unlike those in *Continental*, specifically prohibit

16    stacking. (Opp'n to Lee Mot. 5:20–23, ECF No. 66.) California Capital contends that the *Dailey*

17    lawsuit alleged a single occurrence of continuous injury. (Opp'n to Lee Mot. 5:25–6:16, ECF No.

18    66.) California Capital argues that the "most [it] will pay for the sum of all damages . . . arising

19    out of any one occurrence" is $1 million. (Opp'n to Lee Mot. 5:15–19, ECF No. 66.) Thus,

20    California Capital asserts that its coverage was limited to $1 million, regardless of whether the

21    Lees purchased successive policies. (Opp'n to Lee Mot. 11:8–11, ECF No. 66.) In support of its

22    position, California Capital relies on *Safeco Ins. Co. of America v. Fireman's Fund Ins. Co.*, 148

23    Cal. App. 4th 620 (2007), which it contends involved similar facts and policies that did not stack.

24    (Opp'n to Lee Mot. 5:1–19, ECF No. 66.)

25          Looking to the plain language of the policies, it is clear that they do not prohibit stacking.

26

---

27   [5]    2006 Policy at 3, ECF No. 48-4; 2007 Policy at 4, ECF No. 48-5; 2008 Policy at 4, ECF No. 48-6; 2009 Policy at 4, ECF No. 48-7; 2010 Policy at 3, ECF No. 48-8; 2011 Policy at 3, ECF No. 48-9.

28   [6]    2006 Policy at 3, ECF No. 48-4; 2007 Policy at 4, ECF No. 48-5; 2008 Policy at 4, ECF No. 48-6; 2009 Policy at 4, ECF No. 48-7; 2010 Policy at 3, ECF No. 48-8; 2011 Policy at 3, ECF No. 48-9.

True, *each policy* states that its per-occurrence coverage is capped at $1 million, but the policies do not state that the per-occurrence limit applies across policy periods.[7]  Just the opposite: as the Lees point out, each policy refers to its per-occurrence limit on an annual basis.  For example, each policy states "the limits of this policy apply separately to each consecutive annual period."[8]  That language makes plain that the policy limits "apply separately" to each policy period.  That is precisely the point of stacking.  Even assuming the policies are ambiguous, the Lees prevail since, "Provisions which purport to exclude coverage or substantially limit liability must be set forth in plain, clear and conspicuous language." *Thompson v. Occidental Life Ins. Co.*, 9 Cal. 3d 904, 921 (1973) (citing *Gray v. Zurich Ins. Co.*, 65 Cal. 2d 263, 273 (1966)).  If the policies do not clearly allow stacking, neither do they clearly prohibit it.

California Capital's reliance on *Safeco* is misplaced for two reasons.  First, *Safeco* was decided by a California court of appeal in 2007, before the California Supreme Court decided *Continental*.  Second, *Safeco* is inapposite because the operative issue in *Safeco* was different than the issue in the instant case.  In the instant case, the issue is whether policy limits can be stacked when an ongoing occurrence spans multiple policy periods.  In *Safeco*, the issue was whether an ongoing occurrence existed at all.  *Safeco*, 148 Cal. App. 4th at 625.  *Safeco* involved liability for damage from a landslide.  *Id.*  The landslide itself happened quickly but debris from the landslide was not cleaned up for several years.  *Id.*  Damage from the landslide thus existed throughout multiple policy periods, but the parties disputed whether the lingering damage created an "occurrence" that spanned multiple policy periods.  *Id.*  In the instant case, *Dailey* did not allege a sudden accident and lingering damage.  *Dailey* alleged an ongoing, continuous, and progressive injury, as California Capital itself points out.  (Opp'n to Lee Mot. 6:10–11, ECF No. 66.)  As noted above, herein, *Continental* is on point with the instant matter, not *Safeco*.

California Capital's attempt to distinguish *Continental* is also unavailing.  California Capital asserts that its policies, unlike the policies in *Continental*, contain anti-stacking

---

[7]     2006 Policy at 3, ECF No. 48-4; 2007 Policy at 4, ECF No. 48-5; 2008 Policy at 4, ECF No. 48-6; 2009 Policy at 4, ECF No. 48-7; 2010 Policy at 3, ECF No. 48-8; 2011 Policy at 3, ECF No. 48-9.
[8]     2006 Policy at 42, ECF No. 48-4; 2007 Policy at 42, ECF No. 48-5; 2008 Policy at 42, ECF No. 48-6; 2009 Policy at 42, ECF No. 48-7; 2010 Policy at 43, ECF No. 48-8; 2011 Policy at 41, ECF No. 48-9.

1  provisions.  (Opp'n to Lee Mot. 5:20–23, ECF No. 66.)  California Capital also contends that

2  those anti-stacking provisions are the text of each policy's "Liability and Medical Expenses

3  Limits of Insurance" section.  (Opp'n to Lee Mot. 5:14–18, ECF No. 66).  In each policy, that

4  section states "[t]he most [California Capital] will pay for the sum of all damages because of

5  all . . . "Bodily injury" . . . arising out of any one "occurrence" . . . is the Liability and Medical

6  Expenses limit shown in the Declarations."  (SUF3 No. 2, ECF No. 75.)  The Court notes that the

7  policies in *Continental* contained language virtually identical to the California Capital policies,

8  herein, and the *Continental* court held that the policies did not prohibit stacking.[9] The *Continental*

9  policies stated "[t]he limits of [the insurer]'s liability shall be . . . [a specified dollar

10  amount] . . . each occurrence."  *State of Cal. v. Cont'l Ins. Co.*, 88 Cal. Rptr. 3d 288, 305 (2009),

11  *aff'd*, 55 Cal. 4th 186 (alterations in original).  California Capital's contention that each policy's

12  "Liability and Medical Expenses Limits of Insurance" section is an anti-stacking provision,

13  (Opp'n to Lee Mot. 5:14–23, ECF No. 66.), is contrary to the *Continental* court's decision that the

14  policies in that case did not contain anti-stacking provisions.  *Cont'l*, 55 Cal. 4th at 202.  Nothing

15  in the California Capital policies suggests a different result is warranted here.

16      The Court concludes that the Lees may stack their policy limits.  Consistent with

17  *Continental*, the Lees were insured up to the policy limit of each policy that was triggered by the

18  *Dailey* lawsuit.[10]  *Dailey* alleged a continuous injury that triggered multiple policy periods.  "[I]f

19  an occurrence is continuous across two or more policy periods, the insured has paid two or more

20  premiums and can recover up to the combined total of the policy limits.  There is nothing unfair

21  or unexpected in allowing stacking in a continuous long-tail loss."  *Cont'l*, 55 Cal. 4th at 202.

22  The Court need not reach the issue of *Blue Ridge* reimbursement because the amount of the

23  *Dailey* settlement did not exceed the Lees' coverage.

24  //

---

25  [9]      *Continental* involved policies issued by several different insurers, but "the pertinent language of all the policies at issue [was] essentially identical." *Cont'l*, 55 Cal. 4th at 193.

26  [10]      In its opposition, California Capital argues that the term "trigger" is relevant to an insurer's duty to defend,
27  but not its duty to indemnify.  (Opp'n to Lee Mot. 4:1–27, ECF No. 66.)  California Capital cites *Safeco* for this proposition.  *Safeco* may have been correct when it was decided. Since then, the Supreme Court of California in *Continental* applied the concept of a continuous-injury trigger to an insurer's duty to indemnify.  *See Fluor Corp. v.*
28  *Superior Court*, 61 Cal. 4th 1175, 1217 (2015) (stating the same).

1          B. <u>Atain and California Capital's Motions: The Coverage Dispute</u>

2          As to the coverage dispute between Atain and California Capital, the insurance companies

3   dispute whether Atain had a duty to defend and indemnify Sierra Pacific in *Dailey*.  The Court

4   will provide a brief overview of those duties to better set out the parties' arguments.  There are

5   two types of insurance relevant to their dispute: primary insurance and excess insurance.  Primary

6   insurance is coverage that applies immediately upon the happening of an occurrence that gives

7   rise to liability for the insured.  *E.g.*, *Olympic Ins. Co. v. Employers Surplus Lines Ins. Co.*, 126

8   Cal. App. 3d 593, 597 (1981).  Excess insurance is coverage that applies only after primary

9   coverage has been exhausted. *Id.*

10          Primary insurers and excess insurers have different obligations.  A primary insurer

11   shoulders a large burden.  Not only must a primary insurer indemnify its insured for losses

12   covered under its policies, but it must also defend its insured whenever the insured faces liability

13   that may even potentially be covered under the policies.  *Montrose Chem. Corp. v. Superior*

14   *Court*, 6 Cal. 4th 287, 295 (1993).  "[T]he duty to defend is broader than the duty to indemnify;

15   an insurer may owe a duty to defend its insured in an action in which no damages ultimately are

16   awarded." *Id.*  On the other hand, where there is no possibility that a claim will be covered, the

17   insurer has no duty to defend.  *Waller*, 11 Cal. 4th at 19.  An excess insurer has no duty to defend

18   or indemnify its insureds until the primary insurance has been exhausted by judgment or

19   settlement.  *Signal Companies, Inc. v. Harbor Ins. Co.*, 27 Cal. 3d 359, 368 (1980); *Cmty.*

20   *Redevelopment Agency v. Aetna Cas. & Sur. Co.*, 50 Cal. App. 4th 329, 339 (1996).

21          Atain and California Capital disagree about the effect of two provisions in the Atain

22   policies.  Both provisions purport to limit the coverage provided under the policies.  The first

23   disputed provision is the Malpractice and Professional Services Exclusion in the Atain policies,

24   which the parties and Court refer to as the Professional Services Exclusion.  Policies like the ones

25   Atain issued to Sierra Pacific have two essential parts: the insuring agreement that defines the

26   risks the policy covers, and a series of exclusions that withdraw coverage for certain risks that are

27   otherwise within the scope of the insuring agreement.  *Waller*, 11 Cal. 4th at 16.  Atain and

28   California Capital agree that the *Dailey* allegations fell within the scope of the Atain policies'

insuring agreements.  (SUF1 No. 15, ECF No. 63.)  The parties dispute whether the Professional

Services Exclusion withdrew that coverage.

The Professional Service Exclusion is present in each of the four successive policies Atain

issued to Sierra Pacific.  In the 2008, 2009, and 2010 policies, the Professional Services

Exclusion states:

> This insurance does not apply to:
>
> "Bodily Injury," "Property Damage," or "Personal and Advertising
> Injury," including payment for loss or defense costs in connection
> with any claim made against any insured based upon, arising out of,
> directly or indirectly resulting from, in consequence of, or in any
> way involving the rendering or failure to render any professional
> service by, but not limited to any Accountant, Architect, Engineer,
> Insurance Agent or Broker, Lawyer, Medical Professional, or Real
> Estate Agent Broker, or any other service that is of a professional
> nature.

(SUF1 No. 12, ECF No. 63.)  The 2007 policy also contains a professional services exclusion,

which states simply that the insurance does not apply to "'Bodily Injury,' 'Property Damage,' or

'Personal and Advertising Injury,' due to the rendering or failure to render any professional

service."  (SUF1 No. 13, ECF No. 63.)

The second disputed provision is the Real Estate Property Managed endorsement.  In the

parlance of the insurance industry, an endorsement is simply an amendment to an insurance

policy.  *Endorsement*, BLACK'S LAW DICTIONARY (10th ed. 2014).  The Real Estate Property

Managed endorsement adds an "other insurance" clause to the policies.  "Other insurance"

clauses are provisions found in most insurance policies that attempt to limit the insurer's liability

where other insurance covers the same risk.  *Fireman's Fund Ins. Co. v. Maryland Cas. Co.*, 65

Cal. App. 4th 1279, 1304 (1998).  There are three main types of "other insurance" clauses: pro

rata clauses, excess clauses, and escape clauses.[11]  The Real Estate Property Managed

endorsement is an excess clause.  The endorsement is the same in each of the four successive

Atain policies.  In relevant part, it states:

---

[11]    Pro rata clauses provide that if there is other insurance available, the insurer is not liable for more than a pro
rata share of the loss.  *Olympic Ins. Co.*, 126 Cal. App. 3d at 598.  Excess clauses provide that if there is other
insurance available, the insurer will not be liable until losses exceed the other insurance.  *Id.*  Escape clauses provide
that if there is other insurance, the insurer will not cover the loss at all.  *Id.*

> With respect to your liability arising out of your management of property for which you are acting as real estate manager, this insurance is excess over any other valid and collectible insurance available to you.

(SUF1 No. 14, ECF No. 63.)  Elsewhere, the Atain policies specify that when the insurance is excess, Atain has no duty to defend Sierra Pacific and no duty to indemnify until Sierra Pacific's other primary insurance is exhausted.[12]

Atain and California Capital first dispute the effect of the Professional Services Exclusion. They agree that Sierra Pacific's liability in *Dailey* is within the scope of Atain's insuring agreement.  (SUF1 No. 15, ECF No. 63.)  But Atain argues the Professional Services Exclusion withdraws coverage for that liability.  (Pl.'s Mot. for Summ. J. ("Atain Mot.") 12:20–15:26, ECF No. 49.)  Atain argues that the Professional Services Exclusion eliminated any possibility that Sierra Pacific's liability in *Dailey* would be covered by the Atain policies, so Atain had no duty to defend or indemnify Sierra Pacific.  (Atain Mot. 20:11–15, ECF No. 49.)  Atain and California Capital also dispute the effect of the Real Estate Property Managed endorsement.  Specifically, they dispute whether the endorsement is enforceable at all.  (Atain Mot. 16:1–17:27, ECF No. 49; Def.'s Mot. for Summ. J. ("CC Mot.") 15:4–16:9, ECF No. 54.)

>    i.    *The Professional Services Exclusion*

Atain and California Capital disagree about whether the Professional Service Exclusion removed from coverage Sierra Pacific's liability in *Dailey*.  Atain argues that Sierra Pacific's liability in *Dailey* arises from its negligence in providing, or failing to provide, a professional service—namely, property management.  (Atain Mot. 14:11–16, ECF No. 49.)  According to Atain, Sierra Pacific was sued for its inadequate performance of a professional service, and thus its liability for that failure is specifically excluded from coverage in the Atain policies.  (Atain Mot. 15:1–5, ECF No. 49.)  Atain argues that it only insured Sierra Pacific for things like premises liability at its offices, "not liability arising out of its rendering of professional services at the apartment complexes it was servicing."  (Atain Mot. 15:23–26, ECF No. 49.)

---

[12]      Rock. Decl. Ex. A at 66, ECF No. 51-1; Rock. Decl. Ex. B at 66, ECF No. 51-2; Rock. Decl. Ex. C at 64, ECF No. 51-3; Rock. Decl. Ex. D at 70, ECF No. 51-4.

1   California Capital disagrees for three reasons.  First, California Capital argues that

2   property management is not a professional service.  (CC Mot. 12:14–13:5, ECF No. 54.)  Second,

3   California Capital argues that, even if property management is a professional service in a general

4   sense, Sierra Pacific's liability stems in part from ordinary rather than professional negligence

5   because Sierra Pacific employees tried to deal with the Pagoda Garden pigeon problem

6   themselves as handymen.  (CC Mot. 13:6–14:2, ECF No. 54.)  Third, California Capital argues

7   that the policy terms as a whole demonstrate that Atain insured Sierra Pacific in the latter's

8   capacity as a property management company.  (Def.'s Opp'n to Pl.'s Mot. for Summ. J. ("Opp'n

9   to Atain Mot.") 6:1–7:6, ECF No. 69.)

10   The Court agrees with California Capital's third argument.  Atain and California Capital

11   devote much of their briefing to debating whether property management is a professional service,

12   but the Court need not probe the metes and bounds of the term "professional services" to resolve

13   their dispute.  The relevant inquiry is not whether property management is a professional service

14   in the abstract.  Instead, the relevant inquiry is what risks Atain and Sierra Pacific mutually

15   intended the policies to cover at the time of contracting.  *See MacKinnon*, 31 Cal.4th at 647–48

16   (stating that a court must give effect to the mutual intention of the parties based on the contract

17   language taken as a whole).

18   The Real Estate Property Managed endorsement undermines Atain's arguments for

19   exclusion.  The endorsement states "[w]ith respect to your liability *arising out of your*

20   *management of property for which you are acting as real estate manager*, this insurance is excess

21   over any other valid and collectible insurance available to you."  (SUF1 No. 14, ECF No. 63

22   (emphasis added).)  The language shows that both Atain and Sierra Pacific recognized that Sierra

23   Pacific could incur some liability, covered under the policies, for actions it undertook as a

24   property manager.  A valid endorsement changes the policy to which it is attached.  *Manzarek v.*

25   *St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1032 (9th Cir. 2008) (citing *Haynes v. Farmers*

26   *Ins. Exch.*, 32 Cal. 4th 1198, 1208 (2004)).  "[I]f a conflict exists between the main body of the

27   policy and an endorsement, the endorsement prevails."  *Id.*  Here, the Real Estate Property

28   Managed endorsement illustrates that the mutual intent of the parties was not to categorically

14

1    withdraw from coverage the risks associated with Sierra Pacific's property management

2    activities.

3                    *ii. The Real Estate Property Managed Endorsement*

4            Atain and California Capital also dispute whether the Real Estate Property Managed

5    endorsement converted Atain into an excess insurer under the circumstances.  Atain argues that

6    the endorsement modified the primary policy it issued to Sierra Pacific, converting it into an

7    excess policy in this case.  (Atain Mot. 16:1–18:6, ECF No. 49.)  Atain also argues that its

8    obligations as an excess insurer never arose because the *Dailey* settlement did not exhaust the

9    California Capital policies for the reasons discussed above.  (Atain Mot. 18:7–19:9, ECF No. 49.)

10   California Capital argues that the endorsement is unenforceable.  (CC Mot. 15:4–16:19, ECF No.

11   54.)

12           California Capital argues that the Real Estate Property Managed endorsement is

13   unenforceable for two reasons.  First, California Capital relies on *Fireman's Fund* and *Edmonson*

14   *Prop. Mgmt. v. Kwock*, 156 Cal. App. 4th 197 (2007), to argue that the Real Estate Property

15   Managed endorsement is unenforceable on its face because California courts routinely disregard

16   excess clauses.  (CC Mot. 15:4–28, ECF No. 54.)  Second, again relying on *Fireman's Fund*,

17   California Capital argues that the Real Estate Property Managed endorsement conflicts with an

18   excess clause in the California Capital policies, so both clauses must be ignored and the losses

19   prorated amongst the policies.  (CC Mot. 16:13–19, ECF No. 54.)  Atain concedes that California

20   Capital is generally correct.  (Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Opp'n to CC

21   Mot.")10:23–11:5, ECF No. 62.)  But Atain points the Court to *Hartford Cas. Ins Co. v.*

22   *Travelers Indem. Co.*, 110 Cal. App. 4th 710 (2003), and argues that the courts do not override

23   the policy language of excess clauses when they are narrowly drafted.  (Opp'n to CC Mot. 11:6–

24   14, ECF No. 62.)  Atain also cites *Hartford* for the proposition that excess clauses do not

25   necessarily conflict simply because they appear initially to be at odds.  (Opp'n to CC Mot. 11:15–

26   21, ECF No. 62.)  A review of California case law provides context for the parties' arguments.

27           California Capital first relies on *Fireman's Fund*.  *Fireman's Fund* was an action between

28   two insurance companies, Fireman's Fund Insurance Company and Maryland Casualty Company.

*Fireman's Fund*, 65 Cal. App. 4th at 1287.  Fireman's Fund paid to defend and settle a lawsuit on behalf of a common insured.  *Id.* at 1302.  Maryland did not contribute.  *Id.*  Fireman's Fund then sought equitable contribution and indemnification from Maryland.  *Id.* at 1288.  Fireman's Fund prevailed before the trial court, but was dissatisfied with the way the court allocated the costs the two insurers had to bear.  *Id.*  Before the trial court and again on appeal, Fireman's Fund argued that it had been allocated more than its fair share of the costs associated with the underlying lawsuit.  *Id.* at 1303.  Specifically, Fireman's Fund argued that an "other insurance" clause in its policies rendered it an excess insurer during part of the relevant period.  *Id.*  That clause stated "[t]his insurance is excess over any other insurance, whether primary or excess, contingent or on any other basis . . . [t]hat is valid and collectible insurance."  *Id.* at 1303 (original emphasis omitted).  A clause in the Maryland policies stated that, when other insurance covered the same loss, losses would be allocated between the insurers on a pro rata basis.  *Id.*  The trial court refused to enforce Fireman's Fund's excess clause.  *Id.*

The court of appeal affirmed.  The court began by noting the general rule that courts "will therefore generally honor the language of excess 'other insurance' clauses when no prejudice to the interests of the insured will ensue."  *Fireman's Fund*. 65 Cal. App. 4th at 1304.  But the court recognized that sometime conflicts arise to test that rule.  For example, "where two or more primary insurers' policies contain excess 'other insurance' clauses purporting to be excess to each other," courts disregard the conflicting clauses and prorate the loss among the insurers.  *Id.* at 1304–05.  As the court noted, if both excess clauses were enforced, the insured would be deprived of protection that it had paid for simply because each policy denied primary coverage based on the existence of the other.  *Id.* (citing *Olympic Ins. Co.*, 126 Cal. App. 3d at 599).

*Fireman's Fund* involved a slightly different scenario, a collision between Fireman's Fund's excess clause and Maryland's pro rata clause.  The court noted several then-recent opinions that had disregarded excess clauses and ordered proration in that scenario.  *Fireman's Fund*, 65 Cal. App. 4th at 1305.  The *Fireman's Fund* court reasoned that several public policy considerations justified that rule.  *Id.*  First, excess clauses can be tantamount to escape clauses, "whereby coverage purports to disappear in the presence of other insurance."  *Id.*  Escape clauses

1    are generally disfavored as a matter of public policy.  *Id.*  Second, the court reasoned that

2    enforcement of the excess clause over the pro rata clause would lead to an absurd result: "courts

3    [would] only predictably enforce proration between policies when they all have conflicting

4    'excess other insurance' language *barring* proration."  *Id.* at 1306 (internal citations omitted).

5    Finally, the court noted that the rules regarding equitable contribution between insurers are

6    different than the rules applicable in a case between an insurer and its insured.  *Id.*  (citing *Signal*

7    *Companies*, 27 Cal. 3d at 369).  In a case between coinsurers, "[t]heir respective obligations flow

8    from equitable principles designed to accomplish ultimate justice in the bearing of a specific

9    burden."  *Id.*  The court considered the equities of the case and held that the trial court properly

10   disregarded Fireman's Fund's excess clauses.  *Id.* at 1307.

11       California Capital also relies on *Kwock*.  Like *Fireman's Fund*, *Kwock* involved an action

12   by one insurer against another for equitable contribution for the costs of settling a personal injury

13   lawsuit against a mutual insured.  *Kwock*, 156 Cal. App. 4th at 200.  The insurers were Farmers

14   Insurance Group and California Capital.  *Id.*  In the underlying lawsuit, a personal injury plaintiff

15   sued both the owner and the property manager of an apartment complex.  *Id.*  California Capital

16   insured the owner, and also the property manager as an additional insured.  *Id.*  Farmers insured

17   the property manager.  *Id.*  California Capital paid to defend and settle the claim.  *Id.*  Farmers did

18   not contribute, arguing that its coverage was excess.  *Id.*  The crux of *Kwock* was whether an

19   indemnification agreement between the property owner and property manager rendered Farmers'

20   policy excess.  *Id.* at 202.  But that argument was only brought to the fore because the court

21   would not enforce an excess clause in the Farmers policy.  *Id.* at 202–04.

22       Unlike *Fireman's Fund*, *Kwock* did not involve conflicting "other insurance" clauses.

23   The Farmers policy contained an excess clause, but the California Capital policy did not.  *Kwock*,

24   156 Cal. App. 4th at 203.  Nevertheless, the *Kwock* court took as a given that the excess clause

25   was unenforceable.  *Id.* at 203–04.  The court reasoned that an excess clause in an otherwise

26   primary policy acts as an escape clause that "attempts to have coverage, paid for with the

27   insured's premiums, evaporate in the presence of other insurance."  *Id.* at 203 (citing *Commerce*

28   *& Industry Ins. Co. v. Chubb Custom Ins. Co.*, 75 Cal. App. 4th 739, 745 (1999)).  As the *Kwock*

1   court noted, "[e]scape clauses are discouraged and generally not given effect in actions where the

2   insurance company who paid the liability is seeking equitable contribution from the carrier who is

3   seeking to avoid the risk it was paid to cover." *Id.*

4         *Fireman's Fund* and *Kwock* illustrate the modern trend, but the modern trend is not an

5   ironclad rule.  Atain relies on *Hartford* for an exception to that trend.  (Atain Mot. 16:11–17:5,

6   ECF No. 49.)  *Hartford* involved an action between coinsurers for declaratory relief concerning

7   who would bear the costs of defending and settling a lawsuit against a mutual insured.  *Hartford*,

8   110 Cal. App. 4th at 712.  The insurance companies were Travelers Indemnity Company and

9   Hartford Casualty Insurance Company.  *Id.*  Travelers insured a landlord and Hartford insured the

10  tenant.  *Id.* at 714–15.  Hartford also insured the landlord under the tenant's policy as an

11  additional insured.  *Id.* at 714, 716.  When the landlord was sued, both Travelers and Hartford

12  accepted the defense and ultimately settled the underlying lawsuit.  *Id.* at 713.  Each insurer then

13  sought a declaratory judgment that it had no liability to defend or indemnify the landlord.  *Id.*

14  Ultimately, the trial court enforced an excess clause in the Travelers policy, entitling Travelers to

15  recoup its costs from Hartford.  *Id.* at 715.  Hartford appealed.

16        On appeal, Hartford argued that the trial court had erred by enforcing the excess clause in

17  the Travelers policy.  *Hartford*, 110 Cal. App. 4th at 724.  The Travelers excess clause was

18  contained in an endorsement entitled Other Insurance—Additional Insureds.  *Id.* at 714–715.

19  That endorsement stated:

20        This insurance is excess over any of the other Insurance; whether
        primary, excess, contingent or on any other basis . . . [t]hat is valid
21        and collectible Insurance available to you [the landlord] if you are
        added as an additional insured under any other policy.
22

23  *Id.*  The Hartford policy also had an excess clause.  The Hartford excess clause provided that

24  Hartford's coverage was primary unless there was other insurance for fire, extended coverage,

25  builder's risks, and similar coverage, and when its policyholder was an additional insured under

26  another policy.  *Id.* at 726.

27        The *Hartford* court recognized the modern trend disfavoring excess clauses, but held that

28  the particular policies in *Hartford* justified enforcement of the Travelers excess clause.  *Hartford*,

110 Cal. App. 4th at 724–26.  The *Hartford* court distinguished *Fireman's Fund* and its kin on two grounds.  First, unlike the broad excess clause in *Fireman's Fund*, the Travelers excess clause was limited to narrow circumstances.  *Id.* at 726–27.  "A clause that carves out this intended exception to primary coverage is not similar to an escape clause, where the insurer appears to offer coverage that in fact evaporates in the presence of other insurance."  *Id.*  Second, also unlike *Fireman's Fund*, the Travelers excess clause and the Hartford excess clause did not conflict:

> By its terms, the Hartford policy is primary except in specified instances that do not apply in this case. The Travelers policy is primary except in the specific instance that does apply in this case—when the insured is named as an additional insured under another policy, which makes the Travelers policy excess by definition. Because the policy terms, as they apply in this case, do not conflict . . . there is no reason to disregard the express terms of both policies.

*Id.* at 727.  The *Hartford* court concluded that equity did not justify overriding the terms of the insurance policies in that case.  *Id.*

California Capital asserts that *Hartford* provides no guidance because it involved an express agreement that required one contracting party to purchase primary insurance while the other contracting party's insurance was agreed to be excess.  (Def.'s Reply 8:17–25, ECF No. 81.)  California Capital is correct that *Hartford* did involve such an agreement, which was one of the terms in a lease.  But that agreement was not why the *Hartford* court distinguished *Fireman's Fund*.  "The result in this case is based on the language of the relevant policies.  References to the terms of the lease serve only to highlight the intent of the parties."  *Hartford*, 110 Cal. App. 4th at 728.

Here, the Real Estate Property Managed endorsement is an excess clause in the spirit of *Hartford*.  It is not tantamount to an escape clause, as California Capital asserts.  Rather, it converts Atain's coverage to excess in one particular scenario, when liability arises out of Sierra Pacific's property management activities.  As *Kwock* illustrates, broad excess clauses are often disregarded because they attempt "to have coverage, paid for with the insured's premiums, evaporate in the presence of other insurance."  *Kwock*, 156 Cal.App.4th at 204.  But that equitable

1    consideration—although compelling—is simply not present in cases where the excess clause

2    applies narrowly and is added by endorsement.  A narrow excess clause added by endorsement is

3    not an insurer's attempt to hoodwink its insured into purchasing illusory coverage.  Rather, it is a

4    contractual provision that declares a policy to be excess "in the situation where the parties and the

5    insurers are most likely to intend that result."  *Hartford*, 110 Cal. App. 4th at 726. *See also*

6    *Certain Underwriters at Lloyds, London v. Arch Specialty Ins. Co.*, 246 Cal. App. 4th 418, 436

7    (2016) (distinguishing *Hartford* because of the difference between broad excess clauses and

8    narrow excess clauses); *Underwriters of Interest Subscribing to Policy No. A15274001 v.*

9    *ProBuilders Specialty Ins. Co.*, 241 Cal. App. 4th 721, 733 (2015) (same).

10          California Capital next argues that if the Real Estate Property Managed endorsement is

11    enforceable at all, it is in conflict with the excess clause in the California Capital policies.  The

12    California Capital excess clause states in relevant part:

13                  If there is other insurance covering the same loss or damage, we
                    will pay only for the amount of covered loss or damage in excess of
14                  the amount due from that other insurance, whether you can collect
                    on it or not . . . .[13]
15

16    California Capital argues that this clause renders its policies excess too, so both excess clauses

17    must be struck and the costs of *Dailey* prorated between the insurers.  (CC Mot. 16:13–19, ECF

18    No. 54.)

19          However, like the policies in *Hartford*, these policies do not actually conflict.  By their

20    terms, both the Atain policies and the California Capital policies are primary unless a predicate

21    condition converts the policies to excess.  In the Atain policies, that predicate condition is a set of

22    factual circumstances leading the insured to face a particular type of liability: "liability arising out

23    of [Sierra Pacific's] management of property."  (SUF1 No. 14, ECF No. 63.)  In the California

24    Capital policies, that predicate condition is the availability of "other insurance covering the same

25    loss or damage."[14]  Sierra Pacific faced liability in *Dailey* arising out of its management of

26

27    ---
      [13]      2006 Policy at 48, ECF No. 48-4; 2007 Policy at 48, ECF No. 48-5; 2008 Policy at 48, ECF No. 48-6; 2009
      Policy at 49, ECF No. 48-7; 2010 Policy at 48, ECF No. 48-8; 2011 Policy at 48, ECF No. 48-9.
28    [14]      2006 Policy at 48, ECF No. 48-4; 2007 Policy at 48, ECF No. 48-5; 2008 Policy at 48, ECF No. 48-6; 2009
      Policy at 49, ECF No. 48-7; 2010 Policy at 48, ECF No. 48-8; 2011 Policy at 48, ECF No. 48-9.

property, so the predicate condition in the Atain policies was met. Atain became an excess insurer in the context of that lawsuit. And because Atain became an excess insurer, it did not provide "other insurance covering the same loss or damage."[15] The predicate condition in the California Capital policies was not met, so California Capital's excess clause could not take effect and create a conflict. *Cf. Cal. State Auto. Ass'n Inter-Ins. Bureau v. Progressive Cas. Ins. Co.*, No. C 11-1747 MEJ, 2012 WL 1438835, at *3 (N.D. Cal. Apr. 25, 2012) (following *Hartford* and finding no conflict between a narrow excess clause and a broad excess clause).[16]

The Real Estate Property Managed endorsement rendered the Atain policies excess with respect to *Dailey*. California Capital's policies were not exhausted for the reasons discussed above. Consequently, Atain's obligations as an excess insurer were not triggered. Atain had no duty to defend or indemnify Sierra Pacific in the *Dailey* lawsuit.

### C. Bad Faith and Breach of Contract

This case also involves a dispute between Atain and California Capital. Armed with Sierra Pacific's assignment of rights, California Capital asserted a claim against Atain for breach of the implied covenant of good faith and fair dealing. (Def.s' Countercl. ¶¶ 47–54, ECF No. 14.) Atain moves for summary judgment on that claim. (Atain Mot. 19:10–20:9, ECF No. 49.) Atain argues that where there is no coverage, there can be no bad faith. (Atain Mot. 19:13–17, ECF No. 49.)

Atain is correct. "It is clear that if there is no *potential* for coverage and, hence, no duty to defend under the terms of the policy, there can be no action for breach of the implied covenant of good faith and fair dealing because the covenant is based on the contractual relationship between the insured and the insurer." *Waller*, 11 Cal. 4th at 36 (emphasis in original). Since this Court

---

[15]     2006 Policy at 48, ECF No. 48-4; 2007 Policy at 48, ECF No. 48-5; 2008 Policy at 48, ECF No. 48-6; 2009 Policy at 49, ECF No. 48-7; 2010 Policy at 48, ECF No. 48-8; 2011 Policy at 48, ECF No. 48-9.

[16]     The Court also notes the irony in California Capital's "conflicting-clauses" argument. Whereas the Real Estate Property Managed endorsement is the type of narrowly drawn excess clause approved in *Hartford*, California Capital's broad excess clause is plainly the kind that California courts disfavor and often do not enforce. Courts sometimes look past policy language in equitable contribution actions because the obligations of coinsurers arise not from contract, but from "equitable principles designed to accomplish ultimate justice in bearing a specific burden." *Fireman's Fund*, 65 Cal. App. 4th at 1295. Even if the Real Estate Property Managed endorsement and California Capital's excess clause were truly in conflict, the Court cannot see how the cause of ultimate justice would be served by disregarding the Real Estate Property Managed endorsement—that is, by allowing an unenforceable clause to cancel out the effect of an enforceable one.

has concluded that Atain had no duty to defend Sierra Pacific in *Dailey*, as a matter of law, California Capital's bad faith claim must fail.

**V.     CONCLUSION**

For the reasons discussed above, the following is hereby ordered:

The Lees' motion for summary judgment (ECF No. 48) is GRANTED.  The Clerk of the Court shall enter judgment in the Lees' favor on California Capital's first and second claims for relief.  (TPC, ECF No. 15.)

Atain's motion for summary judgment (ECF No. 49) is GRANTED. The Clerk of the Court shall enter judgment in Atain's favor on Atain's first and second claims for relief.  (Pl.'s Compl., ECF No. 1.)  The Clerk of the Court shall also enter judgment in Atain's favor on California Capital's first, second, third, fourth, fifth, and sixth claims for relief.  (Df.'s Answer and Countercl., ECF No. 14.)

California Capital's motion for summary judgment (ECF No. 54) is DENIED.

IT IS SO ORDERED

Dated: November 2, 2016

Troy L. Nunley
United States District Judge

22